UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL ANTHONY JASEN,

                Plaintiff,

      v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
_____

<u>DECISION & ORDER</u>

16-CV-6153P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Michael Anthony Jasen ("Jasen") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income Benefits and Disability Insurance Benefits ("SSI/DIB").  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 16).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 14, 18).  For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Jasen's motion for judgment on the pleadings is denied.

# BACKGROUND

## I.     Procedural Background

Jasen applied for SSI and DIB[1] on April 19, 2013, alleging disability beginning on June 30, 2000 due to foot issues, insomnia, and arthritis.  (Tr. 149, 170).[2]  On June 12, 2013, the Social Security Administration denied Jasen's claim for benefits, finding that he was not disabled.  (Tr. 81-82).  Jasen requested and was granted a hearing before Administrative Law Judge James G. Myles (the "ALJ").  (Tr. 15-16, 105-09).  The ALJ conducted a hearing on October 21, 2014.  (Tr. 34-66).  Jasen was represented at the hearing by his attorney Jeffrey E. Marion, Esq. ("Marion").  (Tr. 34, 89).  In a decision dated October 28, 2014, the ALJ found that Jasen was not disabled and was not entitled to benefits.  (Tr. 17-33).

On February 3, 2016, the Appeals Council denied Jasen's request for review of the ALJ's decision.  (Tr. 1-6).  Jasen commenced this action on March 8, 2016, seeking review of the Commissioner's decision.  (Docket # 1).

## II.     Relevant Medical Evidence[3]

### A.     Treatment Records

Treatment records indicate that Jasen received treatment for diabetes, hypertension, hyperlipidemia, and joint pain from Diana Thangathurai ("Thangathurai"), MD, at Lifetime Health Medical Care ("Lifetime") on November 6, 2013.  (Tr. 227-30).  Thangathurai assessed that Jasen suffered from diabetes mellitus, joint pain, hypertension, hyperlipidemia, and

---

[1]   Although Jasen withdrew the claim for DIB during the administrative hearing, subsequent correspondence with the Appeals Council suggests that he wishes to continue to pursue these benefits.  (Tr. 38, 211).

[2]   The administrative transcript shall be referred to as "Tr. __."

[3]   Those portions of the treatment records that are relevant to this decision are recounted herein.

depression.  (*Id.*).  Thangathurai ordered bloodwork.  (*Id.*).  The treatment notes indicate that Jasen was taking various medications, including Metformin HCL, Simvastatin, Glipized, Zoloft, and Ibuprofen.  (*Id.*).

On October 17, 2014, Jasen attended another appointment with Thangathurai for treatment for hypertension and diabetes.  (Tr. 236-41).  Thangathurai reported that Jasen's diabetes was poorly controlled and recommended that he follow a low carbohydrate diet, lose weight, maintain a healthy weight, and exercise regularly.  (*Id.*).  Thangathurai increased Jasen's dosage of Glipizide to twenty milligrams in the morning and one tablet at night.  (*Id.*).  She also increased his dosage of Januvia to 100 milligrams.  (*Id.*).

Thangathurai indicated that Jasen's hypertension was chronic and recommended that Jasen follow a "low salt diet, exercise 30-60 [minutes] most days of the week, [and] maintain [a] healthy weight."  (*Id.*).  Thangathurai also diagnosed Jasen with an onset of white blood cell disease ("WBC disease") and advised him to repeat labs in four weeks.  (*Id.*).

### B.   Medical Opinion Evidence

#### 1.   Harbinder Toor, MD

On May 13, 2013, state examiner Harbinder Toor ("Toor"), MD, conducted a consultative orthopedic examination of Jasen.  (Tr. 231-34).  Jasen complained of chronic pain in the lower back, knees, ankles, and feet due to possible arthritis, and vision problems.  (*Id.*).  Jasen described his back pain as generally constant, dull and achy, although he noted that it was sometimes sharp in the lower back.  (*Id.*).  He indicated that his pain sometimes radiated to his lower leg.  (*Id.*).  He estimated the degree of pain in his knees, ankles and feet to be a level eight out of ten, and complained of occasional swelling in the right ankle.  (*Id.*).  Jasen reported difficulty standing, walking, squatting, bending and lifting.  (*Id.*).

Jasen reported that he was able to prepare meals daily, do laundry weekly, and clean monthly.  (*Id.*).  He indicated that he was able to care for his personal hygiene and to shop twice a week.  (*Id.*).  Jasen reported that he enjoyed watching television and light reading.  (*Id.*).

Upon examination, Toor noted that Jasen had a normal gait and did not appear to be in acute distress.  (*Id.*).  He was able to perform the heel and toe walk with difficulty, and could squat to fifty percent of full range.  (*Id.*).  He used no assistive devices and had no difficulty changing for the exam or rising from his chair, although he did have difficulty getting on and off the exam table.  (*Id.*).

Toor noted that Jasen's cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  (*Id.*).  Toor found that Jasen's lumbar and thoracic forward flexion, lateral flexion and lateral rotation were limited to thirty degrees and he could extend to zero degrees.  (*Id.*).  The straight leg raise was positive bilaterally at thirty degrees in both the sitting and supine positions.  (*Id.*).  Toor found no evidence of SI joint or sciatic notch tenderness, spasms, scoliosis, kyphosis, or tender points.  (*Id.*).  Toor found full range of motion in the shoulders, elbows, forearms, wrists, and fingers.  (*Id.*).  He also found full range of motion in the hips, knees, and ankles bilaterally, but noted some tenderness in the knees and ankles bilaterally.  (*Id.*).  Toor assessed strength as five out of five in the upper and lower extremities and found no evidence of sensory deficits.  (*Id.*).  Toor found Jasen's hand and finger dexterity to be intact and his grip strength to be five out of five bilaterally.  (*Id.*).  Toor also reviewed an x-ray of Jasen's left foot that was negative for abnormalities.  (*Id.*).

Toor assessed that Jasen suffered from a history of arthritis in the knees, ankles and feet, and a history of possible arthritis in the lower back, and a history of vision problems.  (*Id.*).  He opined that Jasen had moderate limitations in standing, walking, squatting, bending and

lifting, and that pain interfered with his physical routine. (*Id.*). Toor opined that Jasen's prognosis was fair. (*Id.*).

### 2. Yu-Ying Lin, PhD

On May 13, 2013, state examiner Yu-Ying Lin ("Lin"), PhD, conducted a consultative psychiatric evaluation of Jasen. (Tr. 222-26). Jasen reported that he lived with his brother, who had driven him to the evaluation. (*Id.*). Jasen reported he had obtained an associate's degree and was not currently employed. (*Id.*). He previously had been employed as a machinist, but had not worked since he was laid off in 2000. (*Id.*). Jasen reported no previous mental health treatment. (*Id.*).

According to Jasen, he experienced difficulty falling asleep and decreased appetite. (*Id.*). Jasen reported depressive symptoms, including a dysphoric mood, helplessness, loss of usual interest, fatigue, and diminished self-esteem. (*Id.*). Jasen also reported situational worry, but denied anxiety, suicidal thoughts or homicidal ideation. (*Id.*). He reported that his major stressor was his financial situation. (*Id.*). Jasen indicated that he was able to care for his personal hygiene, cook, clean, do laundry, shop, and manage his money. (*Id.*). Although Jasen reported that he was able to perform these activities without difficulty, he also stated that his brother assisted him when necessary. (*Id.*). Jasen reported that he had a good relationship with his family and friends and was able to drive and take public transportation. (*Id.*).

Upon examination, Lin noted that Jasen appeared casually dressed and well-groomed, had appropriate eye contact and posture, and lethargic motor behavior. (*Id.*). Lin opined that Jasen had fluent, clear speech with adequate language, coherent and goal-directed thought processes, dysphoric affect, dysthymic mood, clear sensorium, full orientation, and average intellectual functioning with a general fund of information appropriate to his experience.

(*Id.*).  Lin noted that Jasen's attention and concentration were generally intact.  (*Id.*).  Lin found

Jasen's recent and remote memory skills to be moderately impaired due to nervousness.  (*Id.*).

According to Lin, Jasen recalled three objects immediately and one object after delay, and he

completed five digits forward and five digits backward.  (*Id.*).

Lin opined that Jasen could follow and understand simple directions, perform

simple tasks independently, maintain a regular schedule, learn new tasks, make appropriate

decisions, and relate adequately with others.  (*Id.*).  Lin opined that Jasen was mildly limited in

maintaining attention and concentration, mildly to moderately limited in performing complex

tasks independently, and moderately limited in appropriately dealing with stress.  (*Id.*).

Lin assessed that Jasen suffered from dysthymic disorder and his prognosis was fair.  (*Id.*).

### 3.    **T. Harding, PhD**

On June 10, 2013, agency medical consultant Dr. T. Harding ("Harding"), PhD,

completed a Psychiatric Review Technique.  (Tr. 77-79).  Harding concluded that Jasen's mental

impairments were not severe.  (*Id.*).  According to Harding, Jasen suffered from mild limitations

in his activities of daily living, ability to maintain social functioning, and ability to maintain

concentration, persistence or pace.  (*Id.*).

### 4.    **Diana Thangathurai, MD**

On October 17, 2014, Thangathurai completed a "Residual Functional Capacity

Assessment - Diabetes."  (Tr. 241).  Thangathurai indicated that Jasen suffered from insulin

resistant Type II diabetes.  (*Id.*).  According to Thangathurai, Jasen could frequently lift five

pounds and could sit and stand for fifteen minutes at a time.  (*Id.*).  Thangathurai opined that

Jasen's insulin resistant diabetes prevented him from working even one hour a day.  (*Id.*).

III.    <u>**Non-Medical Evidence**</u>

In his application for benefits, Jasen reported that he was born in 1961.  (Tr. 202). Jasen reported that he had completed two years of college and had completed tool and die training.  (Tr. 171).  According to Jasen, he was last employed in 2000 and stopped working due to his medical conditions.  (Tr. 170).

Jasen reported that he lived in a house with his brother and did not care for any family members or pets, but was able to care for his personal hygiene without assistance and could regularly prepare simple meals.  (Tr. 178-81).  He reported that he was able to complete household chores, including simple cleaning and laundry, but that his brother completed the yard work and other household chores.  (Tr. 181).  According to Jasen, he left his home twice a week to shop.  (*Id.*).  Jasen was able to drive and leave the house by himself.  (*Id.*).

Jasen reported that he enjoyed watching television and reading approximately two to three hours each day.  (Tr. 182).  Jasen socialized with his family when invited and did not participate in any other social activities on a regular basis.  (Tr. 183).  According to Jasen, his medical conditions limited his ability to lift, stand, walk, navigate stairs, kneel, and squat. (Tr. 183-84).  Jasen reported he had no difficulty sitting.  (*Id.*).  He estimated that he could walk approximately 200 yards before needing to rest.  (Tr. 185).  In addition, Jasen reported difficulty paying attention, although he was typically able to finish tasks and to follow written and spoken instructions.  (*Id.*).  Jasen also reported difficulty with stress and schedule changes.  (Tr. 186).

According to Jasen, he had suffered from constant aching pain for the past twelve years in his back, knees, ankles, and feet.  (*Id.*).  Jasen reported that the pain was aggravated by standing and climbing stairs.  (Tr. 187).  Jasen took Tylenol approximately three times a day to address his pain.  (*Id.*).

During the administrative hearing, Jasen testified that he had obtained an associate's degree in Tool and Dye Technology and had not worked since 2000 due to illness and inability to find employment. (Tr. 38-39). Jasen lived in a house with his brother, and his bedroom was upstairs. (Tr. 41-42). Jasen indicated that he was able to care for his personal hygiene without assistance. (Tr. 42).

According to Jasen, he suffered from diabetes and hypertension, and had been advised to exercise and lose weight. (Tr. 39-40). Jasen indicated that it was difficult for him to exercise due to joint pain. (Tr. 40). He also suffered from constant pain in his back, legs and extremities, and foot swelling and discoloration. (Tr. 45). According to Jasen, he had difficulty bending over due to pain and had difficulty walking and navigating stairs. (Tr. 46). He also experienced discomfort sitting. (Tr. 47). Jasen testified that he frequently experienced cracking and popping in his ankles and joints, which caused difficulty walking. (*Id.*). In addition, Jasen indicated that he experienced weakness in his arms and lower extremities. (Tr. 48, 51). Jasen testified that he was frequently fatigued and had to rest approximately ten times a day for about fifteen minutes at a time. (Tr. 49-50).

Jasen testified that he typically got up at about 7:00 a.m. and spent the day reading the paper and watching television. (Tr. 43). According to Jasen, he had difficulty focusing and often lost interest. (*Id.*). Jasen indicated that he was able to drive for at least fifteen miles at a time, could walk approximately a quarter of a mile at a time, and could stand for approximately fifteen minutes before becoming fatigued. (Tr. 40-41). He also indicated that he was not able to lift more than five pounds. (Tr. 41).

A vocational expert, Corrine Porter ("Porter"), also testified during the hearing. (Tr. 53-64). Before the ALJ began questioning the vocational expert, Jasen's attorney, Marion,

asked and was granted permission to voir dire the expert.  (Tr. 53-56).  The voir dire focused on

Porter's educational background in statistics, as well as her prior employment history.  (*Id.*).  At

one point during the questioning, the ALJ interrupted to ask Marion to explain the relevance of

his line of questioning.  (Tr. 55-56).  Marion indicated that he would explain the relevance after

asking one more question, to which the ALJ replied, "Sure."  (Tr. 56).  After his next question,

Marion objected to the expert's testimony on the grounds of qualifications and inherent bias.

(*Id.*).  The ALJ stated that he would consider the objection and continued the hearing and

questioning of Porter.  (Tr. 56-57).

 The ALJ asked Porter whether a person would be able to perform jobs existing in

the national economy who was the same age as Jasen, with the same education and vocational

profile, and who was limited to light exertion, but was unable to climb ladders, ropes or

scaffolds, could occasionally climb stairs, could engage in frequent fingering, had to avoid

concentrated exposure to hazards, and was limited to work involving an SVP[4] of four or less.

(Tr. 57).  The ALJ further specified that the work should not involve frequent interaction with

the public and should not involve production quotas.  (*Id.*).  Marion objected to the hypothetical

on the grounds that it did not reflect the medical evidence of record.  (*Id.*).  The ALJ overruled

the objection and allowed Porter to answer the question.  (*Id.*).  Porter responded that she

believed the limitations described by the ALJ would permit Jasen to work as a routing clerk, a

cleaner, or a light bagger.  (Tr. 57-58).

 The ALJ asked Porter whether her testimony would be affected if the individual

would need an option to rest for a few minutes or to sit after 30 minutes of standing or walking.

(Tr. 58).  Jasen's attorney again objected, and the ALJ allowed Porter to answer.  (*Id.*).  Porter

---

[4] "'SVP' stands for 'specific vocational preparation,' and refers to the amount of time it takes an individual to learn to do a given job."  *Urena-Perez v. Astrue*, 2009 WL 1726217, *20 n.43 (S.D.N.Y.), *report and recommendation adopted as modified*, 2009 WL 1726212 (S.D.N.Y. 2009).

opined that there would be jobs that such an individual could perform, such as routing clerk, cleaner, and sewing machine operator.  (*Id.*).  Porter testified that the additional limitation would preclude work as a bagger.  (*Id.*).

Marion asked Porter to identify the statistical source for the job numbers she provided for the routing clerk and cleaner provisions.  (Tr. 59).  Porter responded that the numbers were provided by the First Quarter 2014 issue of Occupational Employment Quarterly, a private publication that relies upon information from the United States Department of Labor.  (Tr. 60).  Porter explained that the Department of Labor obtains the information from the census codes.  (*Id.*).

Marion asked whether Porter had a census form in front of her, and she replied affirmatively.  (*Id.*).  Marion asked Porter to identify where exertional ability was indicated on the census form.  (*Id.*).  Porter attempted to respond, but was interrupted by Marion.  (*Id.*).  Porter requested to be permitted to complete her answer and explained that using the census code for routing clerk, she could cross-reference the Occupational Employment Quarterly, which was broken down into skill levels, which themselves were broken down into exertional categories of sedentary, light, medium, and heavy.  (*Id.*).  Again, Marion interrupted Porter's answer, and asked the ALJ to direct Porter to answer his question.  (Tr. 61).

The ALJ attempted to respond, but was interrupted by Marion.  (*Id.*).  The ALJ asked Marion to stop and stated that Porter had been attempting to answer the question and that he did not understand the relevance of Marion's line of questioning.  (*Id.*).  Marion suggested that he be permitted to repeat his question.  (*Id.*).  The ALJ indicated that Marion was free to continue questioning Porter, but noted that Marion had already objected to her qualifications and could challenge the job numbers provided by Porter in post-hearing briefing.  (*Id.*).  The ALJ

stated that Porter had provided the sources of her job numbers and that her testimony appeared consistent with other testimony he had heard in other cases. (*Id.*). The ALJ told Marion that he would be permitted to question Porter, but that his time would be limited. (*Id.*).

Marion again asked Porter where on the census form the person completing the form was asked to describe the exertional level of their employment. (Tr. 62). Porter responded that she did not have an individual census form in front of her but could retrieve one from the internet. (*Id.*). Marion responded, "Okay. Bring one up and tell me where it would talk about exertional levels." (*Id.*). The ALJ interjected that there was not enough time to do so. (*Id.*). Marion replied that he should be entitled to make a record, but that he could provide the answer in the interest of time. (*Id.*). He stated that the census forms do not record exertional level information. (*Id.*).

Marion returned to the issue of census codes. (Tr. 62-63). Porter testified that the census obtains numbers of jobs associated with various positions from government sources, including estimates from the United States Department of Labor Division of Occupational Employment Statistics, as well as the local area unemployment statistics. (*Id.*). Marion asked how the estimates are derived from the census information. (Tr. 63). Porter responded that the estimates come from the Bureau of Labor. (Tr. 63-64). Marion asked, "Where do they get it from"? (Tr. 64). Porter started to answer, the ALJ began to interject, and Marion responded, "[T]hat's fine. I think I've made my point here." (*Id.*). He then objected to Porter's testimony about job numbers as lacking any statistical basis. (*Id.*).

**DISCUSSION**

**I.**    **Standard of Review**

        This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

        To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent

12

they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five-steps are:

> (1) whether the claimant is currently engaged in substantial gainful activity;
>
> (2) if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3) if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4) if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5) if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

**A.    The ALJ's Decision**

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims.  (Tr. 20-30).  Under step one of the process, the ALJ found that Jasen had not engaged in substantial gainful activity since April 19, 2013, the application date.  (Tr. 22).  At step two, the ALJ concluded that Jasen had the severe impairments of diabetes mellitus, osteoarthritis, and an affective disorder.  (*Id.*).  The ALJ concluded that Jasen's other impairments, including hypertension and visual impairments, were not severe.  (Tr. 23).  He also concluded that Jasen's complaints of lower back pain did not constitute a medically determinable impairment.  (*Id.*).  At step three, the ALJ determined that Jasen did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments. (Tr. 23-25).  With respect to Jasen's mental limitations, the ALJ concluded that Jasen had mild restrictions in activities of daily living and social functioning, and moderate difficulties in maintaining concentration, persistence and pace as a result of problems dealing with stress.  (*Id.*). The ALJ concluded that Jasen had the Residual Functional Capacity ("RFC") to perform light work, but would be unable to climb ladders, ropes or scaffolds, could only occasionally climb stairs, could perform frequent, but not continuous handling, fingering and feeling, had to avoid concentrated exposure to hazards, and could perform work requiring an SVP of four or less. (Tr. 25-28).  At steps four and five, the ALJ determined that Jasen did not have any relevant past work, but that other jobs existed in the national and regional economy that Jasen could perform, including the positions of routing clerk, cleaner, and bagger.  (Tr. 28-29).  The ALJ noted that

even if a sit/stand option were incorporated into Jasen's RFC, positions still existed within the national economy that Jasen could perform. (*Id.*). Accordingly, the ALJ found that Jasen was not disabled. (*Id.*).

**B.** **Jasen's Contentions**

Jasen contends that the ALJ's determination is not supported by substantial evidence and is the result of legal error. (Docket # 14-1). First, Jasen maintains that the ALJ grossly mischaracterized the record and exhibited an impermissible bias. (*Id.* at 10-12). Next, Jasen maintains that the ALJ improperly applied the treating physician rule in determining to give Thangathurai's opinion less than controlling weight. (*Id.* at 12-16). In his reply papers, Jasen raises two new arguments: that the ALJ's hypotheticals to the vocational expert were based upon a flawed RFC analysis, and that the ALJ failed to properly consider whether Jasen's impairments satisfied Listings 1.02, 1.04 and 9.00. (Docket # 19 at 4, 5-7).

**II.** **Analysis**

**A.** **Characterization of the Record**

I turn first to Jasen's contention that the ALJ mischaracterized the record in several respects which, in combination with the ALJ's interventions during Marion's examination of the vocational expert, demonstrate that the ALJ was biased. (Docket ## 14-1 at 10-12; 19 at 3-4). Having carefully reviewed the record, I reject this contention entirely.

"[D]ue process requires that [an] ALJ[] be impartial and unbiased during administrative proceedings." *Pabon v. Comm'r of Soc. Sec.*, 2015 WL 4620047, *5 (S.D.N.Y.) (citing *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982)), *report and recommendation adopted*, 2015 WL 5319265 (S.D.N.Y. 2015). Indeed, a presumption exists that ALJs are

unbiased and "exercise their decision-making authority with honesty and integrity." *Id.* "A claimant alleging the denial of a fair hearing . . . bears the burden of showing a 'conflict of interest or some other specific reason for disqualification.'" *Id.* (quoting *Schweiker v. McClure*, 456 U.S. at 195). The basis for the disqualification on the grounds of bias must be clear from the record and "cannot be based on speculation or inference," *Card v. Astrue*, 752 F. Supp. 2d 190, 191 (D. Conn. 2010), and a claimant alleging bias "faces a difficult burden," *Pabon v. Comm'r of Soc. Sec.*, 2015 WL 4620047 at *5.

In conclusory terms, Jasen argues that the ALJ "grossly mischaracterized the contents of the medical record and omitted substantial portions of [p]laintiff's testimony from his consideration." (Docket # 14-1 at 11). Although the basis of his argument is not entirely clear, Jasen appears to contend that the ALJ's recitation of the record incorrectly overstated his ability to engage in physical activity. (*Id.*). According to Jasen, his testimony demonstrates that he could sit or stand for only about fifteen minutes at a time, could lift or carry only about five pounds at a time, and could drive only about fifteen minutes at a time. (*Id.*).

A careful review of the ALJ's decision reveals that he accurately summarized Jasen's hearing testimony, but ultimately concluded that Jasen's allegations about his limitations were inconsistent with his testimony concerning his daily activities and his previous reports regarding his daily activities. (Tr. 27). For example, the ALJ specifically noted that Jasen testified that he was unable to lift more than five pounds, but noted that his reported activities, including personal care, light cleaning, housework and ability to prepare meals, were inconsistent with that testimony. (*Id.*).

Jasen's contention that *Poles v. Colvin*, 2015 WL 6024400 (W.D.N.Y. 2015), supports his argument is misplaced. In *Poles*, the court concluded that the ALJ improperly

emphasized the claimant's history of incarceration, drug use, and criminal convictions in making his determination. *Poles v. Colvin*, 2015 WL 6024400 at *2. Further, the ALJ ignored treatment records from three providers in concluding that the plaintiff had not demonstrated a significant treatment history for her alleged impairments. *Id.* at *4. Under these circumstances, the court in *Poles* found that the ALJ's mischaracterization of the medical records and omission of "substantial portions of [p]laintiff's treatment notes" warranted remand. *Id.* Here, in contrast to *Poles*, Jasen has failed to identify any particular evidence that the ALJ mischaracterized, and this Court has found none. Simply put, I find no support for Jasen's contention that the ALJ mischaracterized or selectively considered the record.

Jasen maintains that the ALJ's alleged interference with Marion's cross-examination of the vocational expert further demonstrates bias. Again, I disagree. My review of the testimony suggests that the ALJ was appropriately attempting to control the proceedings before him to ensure that relevant testimony was clearly presented. *See Luttrell v. Astrue*, 2010 WL 3824564, *10 (N.D. Okla. 2010) ("the ALJ has full authority, provided by Congress, over the proceedings, . . . 'to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits'") (quoting 42 U.S.C. § 405(a)), *aff'd*, 453 F. App'x 786 (10th Cir. 2011). Contrary to Jasen's contention, the transcript does not reveal bias on the part of the ALJ or improper attempts by him to interfere with counsel's cross-examination of the vocational expert.[5]

---

[5] In any event, even if the ALJ had interfered with Jasen's counsel's cross-examination of the expert, Jasen has failed to demonstrate any resulting prejudice. *See Charles v. Astrue*, 291 F. App'x 552, 555 (5th Cir. 2008) ("[a]ppellant has failed to show that any interruptions caused him prejudice, as the ALJ's interruptions did not prevent [a]ppellant's counsel from asking all his desired questions and making all his relevant points"); *Dorrell v. Comm'r of Soc. Sec.*, 2015 WL 3465824, *7 (M.D. Fla. 2015) ("a review of both transcripts belies any contention that [p]laintiff did not have an adequate opportunity to cross-examine the VE or that the hearing was otherwise improperly cut short"); *Fiozzo v. Barnhart*, 2011 WL 677297, *4 (N.D.N.Y.), *report and recommendation adopted*, 2011 WL 675415 (N.D.N.Y. 2011) ("[a]lthough his attorney's cross-examination of the record was undeniably

*See Charles v. Astrue*, 291 F. App'x at 555 ("[a]lthough the ALJ frequently intervened during [a]ppellant's counsel's cross-examination of the medical and vocational experts, these interventions appear substantially justified"); *Dorrell v. Comm'r of Soc. Sec.*, 2015 WL 3465824 at *7 ("[w]hile the ALJ was impatient with the repetitive nature of counsel's questioning of the VE, she was never rude or inappropriate and there is no showing of any bias").

The ALJ's decision reflects that he carefully reviewed, considered, and weighed the conflicting evidence and fully explained the conclusions he reached and the bases for them. Allegations of bias are serious challenges and should not be trivially made. Nothing in the ALJ's decision or conduct in the hearing supports Jasen's claim of bias. Accordingly, remand is not warranted.[6] *See, e.g.*, *Strange v. Comm'r of Soc. Sec.*, 2014 WL 4637093, *6 (N.D.N.Y. 2014) ("[v]iewing the bias allegation in context of the whole case, there is nothing about [the ALJ's] behavior during conduct of the hearing or in penning his decision that suggests extremism or inability to render a fair decision"); *Battaglia v. Astrue*, 2012 WL 1940851, *11 (E.D.N.Y. 2012) (rejecting claim of bias based upon ALJ's "allegedly aggressive questioning style, [and] his repeated interruptions of [plaintiff's] testimony" where "ALJ's questions and 'interruptions' generally served to clarify the testimony and the issues to be decided, and did not demonstrate a clear bias or inability to adjudge plaintiff's disability claim fairly"); *Osorio v. Barnhart*, 2007 WL 1519531, *2 (E.D.N.Y. 2007) (rejecting plaintiff's contention that ALJ was "unnecessarily adversarial, hostile, and argumentative" where hearing transcript demonstrated "that the ALJ's behavior did not rise to the level of antagonism contemplated by th[e] [legal] standard").

---

interfered with, [p]laintiff has not established that any probative evidence or argument was omitted from the record because of this interference").

[6] Jasen's counsel also maintains that portions of the transcript of the administrative hearing were inaccurately transcribed. (Docket # 14-1 at 4 n.1, 5, 9). Even if Jasen's corrections to the hearing transcript are credited, they would not alter my conclusion that the ALJ's decision is supported by substantial evidence and is not erroneous.

## B.        RFC Assessment and Application of Treating Physician Rule

I turn next to Jasen's contentions that the ALJ improperly applied the treating physician rule, resulting in a flawed RFC assessment.  An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

Generally, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2)[7]; *see also Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010) ("the ALJ [must] give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence").  Thus, "[t]he opinion of a treating physician is generally given greater weight than that of a consulting physician, because the treating physician has observed the patient over a longer period of time and is able to give a more detailed picture

---

[7] This regulation applies to claims filed before March 27, 2017.  For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply.

of the claimant's medical history." *Salisbury v. Astrue*, 2008 WL 5110992, \*4 (W.D.N.Y. 2008).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must explicitly consider:

(1)    the frequency of examination and length, nature, and extent of the treatment relationship,

(2)    the evidence in support of the physician's opinion,

(3)    the consistency of the opinion with the record as a whole,

(4)    whether the opinion is from a specialist, and

(5)    whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x at 199. The regulations also direct that the ALJ should "give good reasons in [his] notice of determination or decision for the weight [he] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(c)(2)). "Even if the above-listed factors have not established that the treating physician's opinion should be given controlling weight, it is still entitled to deference, and should not be disregarded." *Salisbury v. Astrue*, 2008 WL 5110992 at \*4. The same factors should be used to determine the weight to give to a consultative physician's opinion. *Tomasello v. Astrue*, 2011 WL 2516505, \*3 (W.D.N.Y. 2011). "However, if the treating physician's relationship to the claimant is more favorable in terms of the length, nature and extent of the relationship, then the treating physician's opinion will be given more weight than that of the consultative examining physician." *See id.*

Judged under relevant caselaw, it is unclear whether Thangathurai qualifies as a treating physician because the record suggests that she met with Jasen on only two occasions before rendering her opinion in this case. (Tr. 227-30, 235-41). Indeed, in his application for benefits, Jasen indicated that he was not taking any prescription medications or receiving any medical treatment. (Tr. 76, 172-73). Although Jasen supplemented his paperwork in June 2014 to suggest that he met with Thangathurai on five occasions after his application, the treatment records only document appointments on November 6, 2013, and October 17, 2014. (Tr. 206, 227, 236). The lack of an established, ongoing relationship undercuts Jasen's contention that Thangathurai should be considered a treating physician. *See Patterson v. Astrue*, 2013 WL 638617, *8 (N.D.N.Y.) ("three examinations by [a physician] over the course of four months . . . does not constitute the type of 'ongoing relationship' that is required for finding that s/he is plaintiff's treating physician under the relevant regulations") (citing 20 C.F.R. §§ 404.1502, 416.902), *report and recommendation adopted*, 2013 WL 592123 (N.D.N.Y. 2013); *Cascio v. Astrue*, 2012 WL 123275, *3 (E.D.N.Y. 2012) (ALJ reasonably determined "that two isolated visits, approximately one year apart, did not constitute an 'ongoing treatment' relationship rising to the level necessary for [the physician] to qualify as a treating physician"); *Rylee v. Astrue*, 2010 WL 3039602, *7 (S.D. Ala. 2010) ("[t]he treating physician rule does not apply to a physician who bases his opinions of a claimant's limitations on a limited number of visits"); *Seaton v. Astrue*, 2010 WL 2869561, *8 (N.D.N.Y. 2010) ("the ALJ's finding that . . . two visits did not constitute an 'ongoing treatment relationship' is reasonable and shall not be disturbed by this [c]ourt"); *Redmond v. Astrue*, 2009 WL 2383026, *7 (N.D.N.Y. 2009) (finding doctor was not treating physician whose opinion was entitled to controlling weight, noting it "appear[ed] that he only examined [p]laintiff on one occasion"); *Sapienza v. Shalala*, 894 F. Supp. 728, 733

(S.D.N.Y. 1995) ("[t]he administrative record provides substantial support for the ALJ's conclusion that [physician] was not a treating physician[;] [t]he record indicates that [he] had examined [plaintiff] only once").

In any event, remand is not required simply because an ALJ fails to refer explicitly to each regulatory factor in determining the weight to assign a treating physician's opinion. *See Molina v. Colvin*, 2014 WL 3925303, *2 (S.D.N.Y. 2014) (remand not appropriate where ALJ failed to refer explicitly to each statutory factor) (citing *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) ("rejecting challenge to ALJ's 'failure to review explicitly each factor provided in 20 C.F.R. 404.1527(c)(2)' because the Second Circuit 'requires no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear'"). Here, the ALJ's determination reflects his thorough review of the record, including a summary of Thangathurai's treatment notes. (Tr. 26). Indeed, the ALJ specifically noted Jasen's infrequent treatment history with Thangathurai and that the limitations assessed by Thangathurai were not consistent with her treatment recommendations. (Tr. 26, 28). On this record, although the ALJ might not have discussed each of the factors, his decision, read in its entirety, supports the conclusion that the ALJ "conscientiously applied the substance of the treating physician rule." *See id.* (internal quotation omitted); *see also Scitney v. Colvin*, 41 F. Supp. 3d 289, 301 (W.D.N.Y. 2014) ("an ALJ does not have to explicitly walk through each of these factors, so long as the Court can 'conclude that the ALJ applied the substance of the treating physician rule . . . and provide[d] 'good reasons' for the weight she gives to the treating source's opinion'") (quoting *Halloran*, 362 F.3d at 32).

I also conclude that the ALJ provided "good reasons" for his decision to give "little weight" to Thangathurai's opinion that Jasen was incapable of working at any exertional

level and that his physical impairments significantly restricted his ability to stand and lift. (Tr. 28). In his decision, the ALJ explained that he discounted Thangathurai's opinion because it was inconsistent with other substantial evidence in the record and noted that nothing in the record supported a conclusion that Jasen's impairments prevented him from working at the light exertional level. (Tr. 26). I agree that substantial evidence in the record conflicts with Thangathurai's opinion regarding Jasen's physical limitations. First, Jasen's own attorney conceded that Jasen appeared capable of performing sedentary work, a concession that is inconsistent with the severe physical limitations assessed by Thangathurai. (Tr. 44) ("we would concede that [Jasen] is potentially capable of sedentary work"). Further, as noted by the ALJ, Jasen's reported activities of daily living are inconsistent with the severe limitations assessed by Thangathurai. Although Jasen testified at the hearing that he had significant limitations in his ability to lift, stand, sit and walk, his previous reports of his abilities were not so limiting. Indeed, Jasen reported that he had no difficulty sitting and could care for his personal hygiene, prepare meals daily, perform household chores, including laundry and cleaning, shop twice a week, and drive. Additionally, Thangathurai's opinion is incompatible with Toor's opinion that Jasen only suffered from moderate lifting, standing, and walking limitations. Moreover, nothing in Thangathurai's treatment notes supports the severe limitations she assessed – limitations that are themselves inconsistent with her treatment recommendation that Jasen participate in physical activity most days of the week for up to an hour at a time. (Tr. 238).

In sum, I find that the ALJ did not violate the treating physician rule by determining to afford "little weight" to Thangathurai's opinion for the reasons he explained. *See Scitney v. Colvin*, 2014 WL 4058975 at *11-12 (ALJ properly discounted opinion of treating physician where the opinion was inconsistent with the record as a whole, including the opinions

of state consultative physicians and claimant's testimony of daily activities); *Molina v. Colvin*, 2014 WL 3925303 at *2 (ALJ did not err in declining to credit opinion of treating physician where the "opinion was contradicted by 'other substantial evidence in the record,' including two other doctors' opinions"); *Atwater v. Astrue*, 2012 WL 28265, *4-5 (W.D.N.Y. 2012) (ALJ properly found treating physician's opinion inconsistent with record as a whole where opinion conflicted with opinions of state agency medical consultants and was inconsistent with claimant's reported activities), *aff'd*, 512 F. App'x 67 (2d Cir. 2013).

In any event, the ALJ's RFC assessment was supported by substantial evidence. The record reflects that Jasen had sought minimal treatment for his physical impairments and used over-the-counter medications to manage his alleged debilitating pain. (Tr. 187). Evidence of one physical examination is contained in the record (the examination by Toor), and it revealed, with the exception of some range of motion limitations in the lumbar spine, relatively normal range of motion, strength and reflexes in Jasen's upper and lower extremities. The ALJ's RFC accounted for Jasen's physical impairments by limiting him to light work with climbing, handling, and environmental limitations. I conclude that the ALJ's RFC assessment was reasonable and supported by substantial evidence. *Pellam v. Astrue*, 508 F. App'x 87, 91 (2d Cir. 2013).

I reject Jasen's contention that the ALJ erred by failing to recontact Thangathurai to request clarification of her opinion. (Docket # 14-1 at 15). Here, the record contained an opinion from another medical professional regarding Jasen's ability to perform the physical requirements of work. "[W]here, as here, the particular treating physician's opinion that is at issue is unsupported by any medical evidence and where the medical record is otherwise complete, there is no duty to recontact the treating physician for clarification." *Ayers v. Astrue*,

2009 WL 4571840, *2 (W.D.N.Y. 2009). In any event, the relevant inquiry is whether the record was sufficient to support the ALJ's RFC assessment. *See Kunkel v. Comm'r of Soc. Sec.*, 2013 WL 4495008, *16 (W.D.N.Y. 2013) ("the issue is whether the record was adequate to permit the ALJ to determine whether or not [p]laintiff was disabled"). In this case, for the reasons discussed above, it was.

### C. Arguments Raised in Jasen's Reply Papers

In his reply papers, Jasen argues for the first time that the ALJ erred because he failed to explain adequately his conclusion that Jasen's impairments did not meet or medically equal Listings 1.02, 1.04 and 9.00. (Docket # 19 at 5-7). Jasen also argues for the first time that the ALJ erred in relying on the vocational expert because the hypothetical posed to the expert was based upon a flawed RFC assessment. (*Id.* at 4). As an initial matter, these arguments are procedurally barred because Jasen failed to raise them in his opening brief. *See Jones v. Astrue*, 2013 WL 802778, *5 (E.D.N.Y. 2013) (claimant's argument procedurally deficient when not raised in its opening brief) (collecting cases). In any event, even if they were properly before the Court, they do not warrant remand.

Jasen's contention that the ALJ erred by not discussing more fully his conclusion that Jasen's impairments did not meet or medically equal Listings 1.02 (major dysfunction of a joint), 1.04 (disorder of the spine) and 9.00 (endocrine) is frivolous. Jasen's attorney unequivocally conceded during the administrative hearing that Jasen's impairments did not meet or medically equal any of the Listings. (Tr. 44 ("[i]t's not our position that he meets or equals any listed impairment, the medical records certainly do not reflect that")). It is troubling that counsel now argues to the contrary, especially without any explanation for his earlier contrary position.

In any event, the ALJ explicitly considered whether Jasen met the requirements of these Listings and determined that he did not. (Tr. 23). The ALJ stated that the medical evidence did "not sufficiently document clinical findings of any physician that suggest that [Jasen's] impairments satisfy" any of the Listings. (*Id.*). Given the sparsity of the medical record, the lack of objective findings to suggest that Jasen's impairments met a Listing, and the concession during the hearing, it is not surprising that the ALJ did not discuss his conclusion more expansively. Moreover, Jasen points to no evidence in the record to suggest that his impairments in fact satisfy the severity requirements of any of the Listings. Accordingly, remand is not required. *See Beebe v. Astrue*, 2012 WL 3791258, *4 (N.D.N.Y. 2012) ("ALJ's failure to provide a specific rationale for finding that plaintiff's spinal impairment did not meet Listing 1.04A" did not require remand where "plaintiff ha[s] not established that she satisfied all the criteria symptoms of the Listing"); *Tilbe v. Astrue*, 2012 WL 2930784, *10 (N.D.N.Y. 2012) ("any error in the ALJ's failure to consider whether plaintiff's impairment met or equaled Listing 1.04 is harmless because no view of the evidence would support a finding that plaintiff's impairment met all the specified medical criteria of Listing 1.04"); *Hunt v. Astrue*, 2009 WL 3076209, *7 (N.D.N.Y. 2009) ("[w]hile the ALJ did not elaborate on his findings in the portion of his decision addressed to step 3, the record contains substantial evidence supporting the ALJ's determination that [p]laintiff did not meet the requirements of Listing 1.04").

Finally, because substantial evidence supports the ALJ's RFC determination, Jasen's challenge to the hypothetical posed to the vocational expert (Docket # 19 at 4) is unavailing. *See Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 319 (W.D.N.Y. 2013) (citing *Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir. 2011) ("[b]ecause we have already concluded

that substantial record evidence supports the RFC finding, we necessarily reject [plaintiff's] vocational expert challenge")).

## CONCLUSION

This Court finds that the Commissioner's denial of SSI/DIB was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 18)** is **GRANTED**. Jasen's motion for judgment on the pleadings **(Docket # 14)** is **DENIED**, and Jasen's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**


_____
                    _s/Marian W. Payson_
                    MARIAN W. PAYSON
                    United States Magistrate Judge

Dated: Rochester, New York
        August 29, 2017